Filed 3/19/15  P. v. Polina CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064796 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS245331) |
| GERONIMO POLINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed as modified and remanded with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

This case arose out of crimes committed by a group of inmates—some of whom were members of the Mexican Mafia prison gang—against a fellow inmate in a prison yard.  In an amended information (information), Geronimo Polina (the appellant in the current appeal) and his two codefendants at trial—Lionel Alvidrez Quinteros and Alberto Macias[1]—were charged with three felony offenses:  (1) conspiracy to commit murder (count 1:  Pen. Code,[2] §§ 182, subd. (a)(1), 187, subd. (a)); (2) attempted murder (count 2:  §§ 187, subd. (a), 664); and (3) assault with a deadly weapon by a prisoner (count 4:  § 4501).  As pertinent here, the information also alleged that Polina committed each crime for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1); and that he had suffered three prior strike convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668).

During trial before a single jury—after Quinteros, Macias, and Polina rested and while the prosecution was presenting the testimony of a rebuttal witness—Macias pulled out a concealed razor blade and slashed his attorney on the cheek in the presence of the

---

[1]     Five codefendants were originally charged in this matter along with Polina: Quinteros, Macias, Jose Manuel Garcia, Juan Gabriel Morones, and Francisco Daniel Valencia.  At some point Valencia pleaded guilty and Garcia and Morones's trial was severed.  The remaining defendants—Polina, Quinteros, and Macias—were jointly tried. Neither Macias nor Quinteros is a party to this appeal.

[2]     All further statutory references will be to the Penal Code unless otherwise specified.

jury.  The court individually questioned in camera the 12 jurors and three alternate jurors, and then excused two jurors and replaced them with alternate jurors.

Quinteros, joined by Polina and Macias, moved for a mistrial based on the slashing incident in the courtroom.  The court denied the three codefendants' mistrial motions.

Polina also moved to sever his trial from Macias's trial based on the same incident. The court denied Polina's severance motion.

Later, Polina brought another motion for a mistrial on grounds the jurors had seen him shackled.  The court denied the mistrial motion.

The jury found Polina guilty of all three charged offenses (conspiracy to commit murder, attempted murder, and assault with a deadly weapon by a prisoner) and found to be true the gang enhancement allegation (§ 186.22, subd. (b)(1)) attached to each of those three counts (counts 1, 2, 4).  Thereafter, the court denied Polina's motion for a new trial.

Later, in a bifurcated proceeding, Polina admitted two of the three prior strike allegations, and the third strike allegation was dismissed.

The court sentenced Polina to an aggregate prison term of 75 years to life plus 16 years.  The sentence consisted of an indeterminate term of 50 years to life for Polina's count 1 conspiracy conviction, plus a consecutive indeterminate term of 25 years to life for his count 2 attempted murder conviction, plus a consecutive determinate upper term of six years for his count 4 aggravated assault conviction, plus a consecutive 10-year term for the count 4 gang enhancement.  The court stayed under section 654 the separate 10-year gang enhancements it imposed as to counts 1 and 2.

3

*The Attorney General's request for judicial notice and Polina's contentions*

The Attorney General has filed a motion requesting that this court take judicial notice of our unpublished September 23, 2014 opinion in codefendant Quinteros's appeal, *People v. Quinteros* (D063547).

Polina raises five contentions on appeal. First, he contends his count 1 conviction of conspiracy to murder his fellow prison inmate Victoriano Ortiz violated his federal constitutional rights to due process and a fair trial and must be reversed "because the conspiracy instructions did not require the jury to find that he personally participated in the conspiracy and personally harbored the specific intent to kill Ortiz."

Second, he contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional right to a fair and impartial jury when it denied his motion for a mistrial after codefendant Macias slashed the face of Macias's attorney in front of the jury.

Third, Polina contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional right to a fair trial when it denied his motion for a mistrial after the court (he claims) unjustifiably allowed him to be visibly restrained in front of the jury following Macias's courtroom assault on his attorney.

Fourth, he contends that, if this court affirms his count 1 conviction of conspiracy to murder Ortiz, the judgment should be modified to stay under section 654 both the consecutive 25-year-to-life sentence imposed for his count 2 conviction of attempted murder and the consecutive 16-year sentence imposed for his count 4 conviction of assault with a deadly weapon by a prisoner and the related count 4 gang enhancement,

4

because "the three offenses for which [he] was convicted [(counts 1, 2, and 4)] were part of a single intent and course of conduct aimed at harming Ortiz, the only named victim in the pleadings." The Attorney General agrees Polina's 25-year-to-life sentence for his count 2 attempted murder conviction should be stayed under section 654, but argues the count 4 sentence should not be stayed under section 654.

Last, Polina contends the 10-year sentence imposed for the count 4 gang enhancement should be reduced to five years under section 186.22, subdivision (b)(1)(B), because his count 4 conviction of assault with a deadly weapon by a prisoner is a serious felony, as defined in section 1192.7, subdivision (c)(13), not a violent felony within the meaning of sections 667.5, subdivision (c), and 186.22, subdivision (b)(1)(C). The Attorney General agrees the 10-year term imposed for the count 4 gang enhancement should be reduced to five years.

For reasons we shall explain, we grant the Attorney General's request for judicial notice. We modify the judgment to reduce the 10-year prison term imposed for the count 4 gang enhancement to a term of five years. We also modify the judgment to stay under section 654 (1) the consecutive 25-year-to-life sentence the court imposed for Polina's count 2 attempted murder conviction, (2) the consecutive six-year sentence the court imposed for Polina's count 4 conviction of assault with a deadly weapon by a prisoner, and (3) the consecutive sentence the court imposed for the count 4 gang enhancement. In all other respects we affirm the judgment and remand the matter to the superior court with directions to correct the abstract of judgment.

5

FACTUAL BACKGROUND[3]

A. *The People's Case*

Victoriano "Cyco" Ortiz testified both as the victim of the July 5, 2010 attack in the prison yard at the Richard J. Donovan Correctional Facility (hereafter Donavan or Donovan Prison) that is the subject of this case, and as an expert on the Mexican Mafia. Ortiz, who had been a member of the Brole gang in Brawley, California, became an associate[4] in the Mexican Mafia. He was incarcerated at Donovan after he was convicted in 2010 of committing an assault in El Centro for the benefit of the Mexican Mafia.

Ortiz indicated that the Mexican Mafia exerts its control inside California prisons and jails and over Southern California Hispanic street gangs. Members of Hispanic street gangs in Southern California are called "Southsiders." The Mexican Mafia is in charge of the Southsiders. A "Sureño" is a full-fledged "soldier" who is very loyal to the Mexican Mafia. To become a Sureño one must assault somebody in prison or do something that shows his alliance with, and respect for, the Mexican Mafia.

Ortiz testified that the Mexican Mafia communicates to inmates through letters. These letters give inmates authority to "run" the prisons, collect "taxes," and "do whatever has to be done" inside the prisons. To show their respect to the Mexican Mafia,

---

[3]     We take judicial notice of the background facts stated in our unpublished opinion in the related appeal, *People v. Quinteros* (Sept. 23, 2014, D063547). (Evid. Code, §§ 452, subds. (a) & (d), 459, subd. (a).)

[4]     Ortiz testified that an associate is somebody who has been "validated" and has "a lot of authority and power . . . for the Mexican Mafia."

6

Southsiders must pay "taxes" to the Mexican Mafia in the amount of one-third of all of the proceeds of their illegal activity.

Ortiz also testified that if a street gang fails to pay their respects to the Mexican Mafia, they can get "greenlighted," which means the members of the gang will be beaten or stabbed when they arrive in prison depending on how "hard" the greenlight is. According to Ortiz, members of the Mexican Mafia commit "[a]ssaults, stabbings, shootings, kidnappings, torture, anything that they have to" in order to "get the point across that the Mexican Mafia is and will be respected." The members commit crimes to collect their money, often by extortion. In the prison, a module contains about 20 cells, and each module is run by a "key holder" who is in charge of collecting the taxes for the Mexican Mafia.

Ortiz testified that when he arrived at Donovan, he believed he had permission to run Donovan based on verbal and written authority that Mexican Mafia member Richard Buchanan gave him. Ortiz established a "mesa" (his team or executive committee) with three other Donovan inmates: Polina ("Blue"), Isaac ("Lazy") Ballesteros, and Manuel ("Stomper") Gonzalez. Before July 2, 2010, Macias (one of Polina's codefendants at trial), a Sureño whom Ortiz knew as "Funny Boy," was also loyal to Ortiz. Ortiz testified that Quinteros (Polina's other codefendant at trial), a Southsider whom Ortiz knew as "Chuco," wanted to become loyal to Ortiz's mesa and told Ortiz he would do whatever Ortiz asked.

According to Ortiz, a power struggle arose when another inmate, "Casper from Fallbrook,"[5] failed to recognize Ortiz's authority. In an attempt to "come together in agreement," Ortiz tried sending written "kites"[6] to Casper indicating that Buchanan had given him authority to run the prison. Ortiz directed Ballesteros to write a kite telling Casper that he and Ortiz needed to "settle up," but Casper refused to do so.

On July 2, 2010, through a vent, Ortiz overheard a Mexican Mafia associate named Jose Manuel "Crazy Joe" Garcia, who sided with Casper, tell Ballesteros to stab or slice Ortiz and Gonzalez with razor blades. Ortiz testified that he also read some kites sent to Ballesteros stating that Crazy Joe (Garcia) said Ortiz and Stomper (Gonzalez) were supposed to get "hit on the next available yard, no exceptions." These kites noted that Ortiz, Polina, Ballesteros, and Gonzalez were "in the hat," which meant they had "mess[ed] up" and were "done." The word "whacked," which means killed, was used in one of the kites. Ortiz testified he was angry that Ballesteros, a member of his mesa, was being ordered to stab him.

Investigators at Donovan received information that Garcia was going to conduct some criminal activity for the Mexican Mafia at the prison. Unbeknownst to the inmates, microphones were placed in the plumbing chase between two cells where Garcia was

---

5     Pablo "Casper" Franco.

6     Ortiz testified that "kites" (or "willas") are "small handwritten notes that [inmates] usually fold and roll up real small the size of a capsule. [U]sually an inmate can sneak it under his tongue, in his tooth, in his gums, or if he has to, in his private areas or his toes, or anywhere, because he gets searched." He stated that kites are "confidential communications between inmates" that "generally talk about either Mexican Mafia or prison politics."

located so that law enforcement officers could glean intelligence. In one recorded conversation, which was played for the jury, Garcia dictated a kite to his cellmate, Juan Morones, giving a direct order for the stabbing of Ortiz.

Knowing from the kites that he might get stabbed, Ortiz went outside to the prison yard on July 5, 2010, at approximately 12:20 p.m., and walked laps with Polina. Ortiz testified that as he walked and talked with Polina, he observed other inmates walking towards a corner near a toilet stall. Polina then swung his hand at Ortiz's face, and Ortiz raised his right hand to block the strike and protect his face. Ortiz felt something cutting his hand. Ortiz testified that Polina was trying to stab him in the neck.

Ortiz also testified that Macias approached him and slashed his head with a razor while Quinteros punched him and held him down.[7] Another inmate named "Cobra" Valencia also assaulted Ortiz. As correctional officers fired shots of increasing lethality, Ortiz's attackers continued to assault him by punching, kicking, and stabbing him, and banging his head against a wall while he tried to cover up and defend himself. As a result of the razor slashes, Ortiz suffered cuts to his head, back, and hand. Macias flushed the razor down the toilet. A video of the incident was played for the jury.

B. *The Defense*

Macias testified that Ortiz was angry with him because a girl named Priscilla liked him. To antagonize Ortiz, Macias took a picture of himself kissing Priscilla and sent it to Ortiz. Macias testified he was not involved in a conspiracy to murder Ortiz, and he

---

[7]    Gonzalez was attacked at the same time as Ortiz.

denied receiving instructions to murder him. He claimed he never received a kite about "putting a hit" on Ortiz.

Macias also testified he and Ortiz argued because Macias was upset that Ortiz had made jokes about the fact that he had been incarcerated for beating up a person in a wheelchair. Following this argument, Macias began carrying a razor in his mouth when he went to the prison yard. On the day of the incident, Macias saw Ortiz walking with Macias's friend, Polina. Macias testified that Ortiz took a "cheap shot" at Polina by punching him from the side. Macias removed the razor from his mouth and began "slicing" Ortiz. Macias also testified he had no intent to kill Ortiz, as the razor was small and flimsy. He stated that he flushed the razor down the toilet. He also testified that Quinteros tried to break up the fight.

Several other inmates testified in Macias's defense. Ortiz's cellmate, Angel Cuadra, testified that Ortiz said he was going to attack Polina. Martin Madrid testified that Ortiz told him Macias had taken his girlfriend, Priscilla, from him. Another of Ortiz's cellmates, Anthony Barrera, testified that Ortiz carried razor blades and was angry with Macias because of a woman. "Stomper" Gonzalez testified he witnessed the fight in the yard between Ortiz and Polina. He stated that Ortiz started the fight by hitting Polina. Gonzalez stated he also became involved in a mutual fight. Gonzalez testified he did not believe a hit was put on him.

DISCUSSION

## I. *THE ATTORNEY GENERAL'S REQUEST FOR JUDICIAL NOTICE*

The Attorney General has filed a motion requesting that this court take judicial notice of our unpublished September 23, 2014 opinion in codefendant Quinteros's appeal, *People v. Quinteros* (D063547). The Attorney General argues that such judicial notice "is necessary to assist the Court in resolving the issues on appeal as two of [Polina's] claims on appeal—whether the trial court abused its discretion in denying [his] mistrial motion after codefendant Macias attacked his attorney, and whether the trial court abused its discretion in denying [Polina's] mistrial motion after the jury observed him in shackles—were addressed in *People v. Quinteros*."

In opposing this request, Polina asserts the Attorney General "should be judicially estopped from asking this court to rely on or take judicial notice of its unpublished opinion in [*People v. Quinteros*]" because the Attorney General successfully opposed both Polina's motion to consolidate his appeal with the appeals of his codefendants Quinteros (D063547) and Macias (*People v. Macias*, D064624) and his request to join in any issues raised by his codefendants that inured to his benefit; and, thus, the Attorney General "cannot now legitimately seek the benefit of the court's ruling in Quinteros' appeal on such common issues simply because the decision is favorable to the People."

We grant the Attorney General's request for judicial notice of this court's opinion in *People v. Quinteros* because two of Polina's claims in his appeal now before this court—whether the trial court abused its discretion during Polina, Quinteros, and Macias's joint jury trial in not declaring a mistrial after Macias attacked his attorney and whether

11

the trial court abused its discretion in not declaring a mistrial after the jury observed Polina and his codefendants in restraints─are virtually identical to claims asserted by Quinteros and addressed by this court in the *Quinteros* opinion. (Evid. Code, §§ 452, subds. (a) & (d), 459, subd. (a); *Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1173 [court may take judicial notice of prior unpublished opinions in related appeals].)

## II. *CLAIM OF INSTRUCTIONAL ERROR* (*COUNT 1*)

Polina first contends his count 1 conviction of conspiracy to murder his fellow prison inmate Ortiz violated his federal constitutional rights to due process and a fair trial─and, thus, his count 1 conviction must be reversed─"because the conspiracy instructions did not require the jury to find that he personally participated in the conspiracy and personally harbored the specific intent to kill Ortiz." This contention is unavailing.

A. *Background*

Polina and his two codefendants (Quinteros and Macias) were charged with (among other crimes) conspiracy to commit murder (count 1: §§ 182, subd. (a)(1), 187, subd. (a)).

1. *The court's instructions*

Following the parties' presentation of evidence, the court instructed the jury with a modified version of CALCRIM No. 563 regarding the elements of this crime. As given, the instruction stated:

> "*The defendants* are charged in Count One with conspiracy to commit murder. To prove that *a defendant* is guilty of this crime, the People must prove that:

12

"1. *A defendant* intended to agree and did agree with one or more inmate loyal to the Mexican mafia to commit the crime of murder;

"2. At the time of the agreement, *a defendant* and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder;

"3. One of the defendants or one of the inmates loyal to the Mexican mafia, committed at least one of the following alleged overt acts to accomplish the crime of murder:

"On or about July 2, 2010, Jose Manuel Garcia, told his cell mate, Juan Morones, to write an inmate message ('Kite') to have inmates Victoriano Ortiz [Cyco] and [Manuel] Gonzalez [Stomper] murdered immediately ('whacked'). Specifically, Garcia told Morones to write the following: Direct orders from the Carnal, Cyko from Brole and Stomper from Market are to be whacked on the next yard ASAP. No exceptions.

"On or about July 5, 2010, inmates Ortiz and Gonzalez were in the prison yard for their group yard activities. While in the yard, Ortiz was assaulted by inmates Polina, Macias, Valencia, and Quinteros;

"On or about July 5, 2010, Polina used an inmate manufactured weapon in his possession to try to cut the neck of inmate Ortiz, who sustained a cut to his hand when he shielded his neck from being cut by Polina in the attack;

"On or about July 5, 2010, Polina, Macias, Valencia, [a]nd Quinteros inflicted other cuts to the body of inmate Ortiz while Valencia and Quinteros punched and tried to hold the arms of Ortiz during the attack.

"4. An overt act was committed in California.

"To decide whether a defendant committed these overt acts, consider all of the evidence presented about the overt acts.

"To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to Instructions which define the crime of murder. (Please see Definition of Homicide below.)

13

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.
"You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.

"A member of a conspiracy does not have to personally know the identity or roles of all the other members.

"Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

"Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy." (First four italics added.)

The court also instructed the jury under CALCRIM No. 415, the general instruction regarding conspiracy. As given, the instruction stated in part:

"I have explained that *a defendant* may be guilty of a crime if he either commits the crime or aids and abets the crime. He may also be guilty if he is a member of a conspiracy.

14

"To prove that *a defendant* was a member of a conspiracy in this case, the People must prove that:

"1. *A defendant* intended to agree and did agree with one or more of [the] inmates loyal to the Mexican mafia to commit the crime of murder;

"2. At the time of the agreement, *a defendant* and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder;

"3. One of the defendants or one of the inmates loyal to the Mexican mafia, committed at least one of the following alleged overt acts to accomplish the crime of murder: [¶] . . .

"4. An overt act was committed in California." (Italics added.)

The court also instructed the jury under CALCRlM Nos. 400 and 401 regarding the theory of aiding and abetting.

2. *The prosecutor's closing arguments regarding the conspiracy count*

During his closing argument, the prosecutor discussed the "theories of culpability" as to the three counts charged against Polina, Quinteros, and Macias:

"First, [the defendants] can be guilty because they committed the crime. They actually did the act that makes them guilty of that crime. So they all committed the crime of conspiracy to commit murder. They all committed the crime of attempted murder, except for Mr. Quinteros, he was an aider and abettor because he didn't have a weapon. [¶] They all committed the crime of assault with a deadly or dangerous weapon. First Macias did, and then Polina did. The others committed the assault by means likely to cause great bodily harm."

The prosecutor then discussed the elements of the conspiracy to commit murder charged in count 1. He stated that "the crime of conspiracy is an agreement between two or more people with the specific intent to agree to commit a crime . . . with the further

15

intent to commit a specific crime." The prosecutor also stated that "there is a further requirement that there is an overt act."

The prosecutor told the jury that the conspirators' agreement could be proved by direct evidence, by circumstantial evidence, or by a combination of both.

The prosecutor then discussed the evidence that supported the conspiracy charge. As pertinent here, he told the jury, "I submit to you, we have . . . direct evidence in the form of that recording from the . . . prison cell. He also stated:

> "So what is the evidence of conspiracy in this case? Well, we know that Ortiz and his mesa were in the hat. We know what that means. They are to be taken out. [¶] We know that Lazy [(Ballesteros)] and Blue [(Polina)] were taken out of the hat. Defendant Polina and . . . [i]nmate Ballesteros were taken out of the hat. We know that because that was a recording. That was recorded by the prison cell. We know we have a direct order from the carnal, which we know now is the Mexican Mafia member, the boss. That was recorded in the [cell recording]. The order is clear. Next yard, no exceptions."

The prosecutor argued that Garcia and Morones passed the "kite" message to Casper, who sent it out the next day to the prison yard, as shown by the recording. The prosecutor then argued:

> "[I]f you analyze the law of conspiracy, there's no proof so far that the defendants in the courtroom are in on it yet. But if you just look at the law of conspiracy, when the kite goes out of the cell, the crime of conspiracy has been committed by these defendants, the defendants in those cells.

> "So when did these defendants here in this courtroom [(Polina, Quinteros, and Macias)] join that conspiracy? That's really the trick in this case, in this count, for you to figure out. Let me tell you what the evidence is for that.

16

"The law says we can use direct and circumstantial evidence of conspiracy.  First let me talk about the recording.

"We know that the Mexican Mafia member gives the order to [Polina] and [Ballesteros], and that's not just two random inmates. The order goes to the inmates that are closest to Ortiz, the members of his mesa, the people that are going to be close to him, the people that he's going to keep his guard down for.

"So *the order is for defendant Polina* and Ballesteros *to basically whack Mr. Ortiz and Mr. Gonzalez.  And it couldn't be any clearer what the point of the conspiracy is.  They have to kill him*.

"So then it's clear that they had direct orders from the Mexican Mafia member, and we know they have to follow those, that Mr. Ortiz and Mr. Gonzalez, . . . the intended targets[,] are supposed to get whacked and supposed to get steel in the next yard.  We know that steel means being attacked with weapons at the next yard.

"We know from the recordings that . . . Casper, the next door neighbor, sent the kite out at the next yard.  And he said *he took defendant Polina . . . and Ballesteros out of the hat, so now they have to perform.  They have to step up and show their loyalty to this mesa*.

"We know the kite goes from 7 to the cage yard and back to 6.  And what happens at the next yard?  The next opportunity these defendants-- I'm sorry, victim Ortiz goes out to the yard is when they hit him.

"The law says . . . that you may consider evidence of acts or statements made before a defendant joined the conspiracy only to show the nature and goals of the conspiracy.  That's why that recording is relevant, because it tells you what the point is.

"Okay.  So the point is to get Stomper and Cyco wacked.  That's the point of the conspiracy.  At the next yard.  No exceptions.

"And of course we have a video recording.  And we all agree that it's not HD, it's not Blue Ray quality.  It's furthest from that.  But it's sufficient for you to see what these defendants are up to.

"The law says that *in a conspiracy, an agreement can be inferred from the conduct if you conclude the members of the alleged conspiracy acted with a common purpose to commit the crime*.

"I submit to you *that's exactly what the video shows, a common purpose to commit the crime*." (Italics added.)

The prosecutor then played for the jury the video of the attack on Ortiz and described what was being shown in the video. The prosecutor concluded by arguing:

"Okay. So if you look at the totality of the evidence, we don't know when . . . these defendants actually agreed to commit the crime of conspiracy to commit murder. Maybe it happened in the cell. But we know at the very, very minimum, it happened outside. We know *they joined that conspiracy at the time of the attack, because it's a coordinated attack*. At the very same time they're attacking Ortiz, they're attacking Gonzalez. [¶] . . .

"Okay. So therefore, I submit to you, members of the jury, all three of the defendants joined that conspiracy to commit murder. And *as soon as they make a move to attack Ortiz, that shows their membership in that conspiracy*, and whatever else they did afterwards for that count doesn't matter. They're good for that charge at that point, all three of them." (Italics added.)

The jury found Polina and codefendant Macias guilty of conspiracy to commit murder as charged in count 1. The third codefendant, Quinteros, was acquitted of that charge.

B. *Applicable Legal Principles*

1. *Standard of review*

"A trial court must instruct the jury, even without a request, on all general principles of law that are [(1)] "'closely and openly connected to the facts, and [(2)] necessary for the jury's understanding of the case."'" (*People v. Burney* (2009) 47 Cal.4th 203, 246.)

18

"Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Following the United States Supreme Court, the California Supreme Court has adopted "the 'reasonable likelihood' standard for reviewing ambiguous instructions under the United States Constitution, inquiring whether there is a reasonable likelihood that the jury misconstrued or misapplied the words in violation of that document." (*People v. Clair* (1992) 2 Cal.4th 629, 663, citing *Estelle v. McGuire* (1991) 502 U.S. 62, *People v. Kelly* (1992) 1 Cal.4th 495, 525.)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos, supra,* 163 Cal.App.4th at p. 1088, citing *People v. Posey* (2004) 32 Cal.4th 193, 218.)

2. *Conspiracy to commit murder*

"The crime of conspiracy is defined in the Penal Code as 'two or more persons conspir[ing]' '[t]o commit any crime,' together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance thereof." (*People v. Swain* (1996) 12 Cal.4th 593, 600 (*Swain*), citing §§ 182, subd. (a)(1), 184.)

"A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.)

19

"[C]onspiracy is a specific intent crime requiring an intent to agree or conspire, and a further intent to commit the target crime, here murder, the object of the conspiracy." (*Swain*, *supra*, 12 Cal.4th at p. 602.) Thus, to sustain a conviction for conspiracy to commit murder, the prosecution is required to prove beyond a reasonable doubt (among other things) that the conspirators "inten[ded] to agree or conspire" to commit the target offense of murder, and they also "inten[ded] to commit the . . . murder, the object of the conspiracy." (*Ibid*.)

"In proving a conspiracy, . . . it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399; see *People v. Vu*, *supra*, 143 Cal.App.4th at pp. 1024-1025 ["The elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.'"].)

C. *Analysis*

1. *Forfeiture*

As a preliminary matter, we reject the Attorney General's claim that Polina forfeited his claim of instructional error by failing to object to the challenged instructions in the trial court. "'Generally, a party may not complain on appeal that an instruction

20

*correct in law* and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570, italics added.)

However, a claim that a jury instruction is not "correct in law" and violated the defendant's right to due process of law "is not of the type that must be preserved by objection." (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7, citing § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

Here, Polina's claim is that the conspiracy instructions given to the jury are "not legally correct" and violated his federal constitutional rights to due process and a fair trial. Accordingly, we reach the merits of Polina's claim of instructional error. (§ 1259; *People v. Smithey*, *supra*, 20 Cal.4th at p. 976, fn. 7.)

2. *Merits*

a. *Instructional error claim*

Polina contends his count 1 conviction of conspiracy to commit murder must be reversed "because the conspiracy instructions did not require the jury to find that he personally participated in the conspiracy and personally harbored the specific intent to kill Ortiz." In support of this claim of instructional error, Polina asserts "the conspiracy instructions only required the jury to find that '[*a*] *defendant*' intended to agree and did agree with one or more inmates to [murder Ortiz]." (Italics added.) He also asserts that the term "[a] defendant" as used in the conspiracy instructions "mean[t] *any one of the*

21

*three defendants on trial* [(Polina, Macias, or Quinteros)], must have entered into such an agreement with other inmates loyal to the Mexican Mafia."  (Italics added.)

Based on his foregoing interpretation of the term "[a] defendant" as used in the conspiracy instructions given to the jury, Polina further asserts that "the instructions given permitted the jury to convict [him] of conspiracy even if the jury concluded only Macias was an actual participant in the conspiracy and harbored the specific intent to kill."  Thus, he contends, "his conviction for conspiracy must be reversed for instructional error because it is reasonably probable, based on the evidence presented at trial and the instructions given, that the jury found him guilty of conspiracy without finding he specifically intended to agree to murder Ortiz and also specifically intended to murder him."

Polina's claim of instructional error is unavailing because he has failed to meet his burden of showing any such error, and, thus, he has failed to demonstrate a reasonable probability that the jury convicted him of count 1 without finding that he (1) specifically intended to agree or conspire to murder Ortiz, and (2) specifically intended to murder him.

The challenged term "[a] defendant" is indeed found in the following portion of the modified version of CALCRIM No. 563 given to the jury, which informed the jury that Polina, Macias, and Quinteros were all charged with conspiracy to commit murder, and then explained the two specific intent elements of that offense:

> "The defendants are charged in Count One with conspiracy to commit murder.  To prove that *a defendant* is guilty of this crime, the People must prove that:

22

"1. *A defendant* intended to agree and did agree with one or more inmate loyal to the Mexican mafia to commit the crime of murder;

"2. At the time of the agreement, *a defendant* and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder . . . ." (Italics added.)

The same specific intent language, including the challenged terms "The defendant" and "a defendant," is contained in the modified version of CALCRIM No. 415, the general instruction regarding conspiracy, which the court also gave to the jury.

The standard conspiracy instructions set forth in CALCRIM No. 563 ("Conspiracy to Commit Murder") and CALCRIM No. 415 ("Conspiracy"), however, use the terms "The defendant" and "the defendant," rather than "A defendant" and "a defendant," in explaining the two specific intent elements.[8]

We reject Polina's assertion that the term "[a] defendant," as used in the portions of the conspiracy instructions pertaining to the specific intent elements of the count 1 conspiracy offense, meant "any one of the three defendants"─Polina, Macias, or Quinteros─that were on trial in this case, for the simple reason that the two terms are not

---

8       For example, the standard instruction regarding conspiracy to commit murder set forth in CALCRIM No. 563 provides in part: "(The defendant[s]/Defendant[s] _____ <*insert name*[*s*]> (is/are) charged [in Count ___] with conspiracy to commit murder [in violation of Penal Code section 182]. [¶] To prove that (the/a) defendant is guilty of this crime, the People must prove that: [¶] 1. *The defendant* intended to agree and did agree with [one or more of] (the other defendant[s]/ [or] _____ <*insert name*[*s*] *or description*[*s*] *of coparticipant*[*s*]>) to intentionally and unlawfully kill; [¶] 2. At the time of the agreement, *the defendant* and [one or more of] the other alleged member[s] of the conspiracy intended that one or more of them would intentionally and unlawfully kill . . . ." (Second and fourth italics added.) The terms "The defendant" and "the defendant" are similarly used in CALCRIM No. 415.

23

synonymous. As noted, the first sentence of the modified version of CALCRIM No. 563 given to the jury, using the plural term "The defendants," stated: "*The defendants* are charged in Count One with conspiracy to commit murder." (Italics added.) Obviously, this sentence informed the jury that *each* of the three defendants in this case was charged in count 1 with conspiracy to commit murder.

Immediately after thus informing the jury that *each* of the three defendants in this case was charged in count 1 with conspiracy to commit murder, the instruction then used the singular term "a defendant" in explaining to the jury the elements that the prosecution was required to prove in order for the jury to find a given defendant guilty of count 1. Specifically, as already noted, the instruction stated:

> "To prove that *a defendant* is guilty of this crime, the People must prove that: [¶] 1. A defendant intended to agree and did agree with one or more of inmate loyal to the Mexican mafia to commit the crime of murder; [¶] 2. At the time of the agreement, a defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder . . . ." (Italics added.)

Any reasonable jury would understand that the term "a defendant" in the first clause—"To prove that *a defendant* is guilty of this crime" (italics added)—meant "a given defendant," and that the subsequent use of the term "a defendant" in this portion of the instruction meant the *same* defendant, *not* "any one of the three defendants" as Polina contends.

Accordingly, we reject Polina's claim that the conspiracy instructions incorrectly stated the law regarding the elements of conspiracy to commit murder.

24

b. *Related insufficiency-of-the-evidence claim*

Polina also claims his count 1 conviction should be reversed because "there was no evidence to show [he] ever actually knew about the conspiracy or order to kill Ortiz, much less that he entered into the agreement to murder Ortiz and intended he be murdered." We reject this claim.

As already discussed, "it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost*, *supra*, 60 Cal.App.4th at p. 1399.) Thus, "[t]he elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.'" (*People v. Vu*, *supra*, 143 Cal.App.4th at pp. 1024-1025.)

Here, Polina specifically acknowledges that "[t]he initiators of the conspiracy, Jose Manuel Garcia and Juan Gabriel Morones, were recorded discussing direct orders to kill several inmates, including [Polina] and Ortiz," and "[t]here was some evidence that [Polina] . . . had [his] name[] taken out of the 'hat' by some other inmate with the proviso that [he] participate in the pending assault [on Ortiz]." This evidence, when considered with Ortiz's testimony that Polina tried to cut his neck during the videotaped prison yard assault, is sufficient to "support[] an inference that the parties . . . tacitly came to a mutual

25

understanding to commit a crime" (*People v. Prevost, supra,* 60 Cal.App.4th at p. 1399), here the murder of Ortiz.

c. *Related contention that the prosecution relied on an improper legal theory*

Finally, contrary to Polina's contention, the record does not show that the prosecution relied on the improper legal theory that Polina could be found guilty of conspiracy by aiding and abetting the assault on Ortiz in the prison yard. CALCRIM No. 415, which the court gave to the jury, informed the jury that conspiracy was separate and distinct from aiding and abetting. Specifically, the instruction explained that "a defendant may be guilty of a crime if he either commits the crime or aids and abets the crime. He may also be guilty if he is a member of a conspiracy." During his closing argument, the prosecutor specifically argued that Polina, Macias, and Quinteros "all committed the crime of conspiracy to commit murder" and that aiding and abetting was only relevant to the attempted murder charge, and only as to Quinteros.

III. *CLAIM THAT THE COURT VIOLATED HIS RIGHT TO AN IMPARTIAL JURY BY DENYING HIS MOTION FOR A MISTRIAL*

Polina also contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional right to a fair and impartial jury when it denied his motion for a mistrial after codefendant Macias slashed the face of Macias's attorney in front of the jury. We reject this contention.

A. *Background*

1. *Macias's courtroom assault on his attorney and related proceedings that day*

On December 13, 2012, after Quinteros, Macias, and Polina rested their cases, the prosecution recalled Ignacio Bravo, a correctional officer at Donovan Prison, as its first rebuttal witness. As Officer Bravo was testifying, Macias slashed his attorney, William Burgener, in the face with a small razor blade he had concealed in his mouth. Burgener jumped up and exclaimed, "What the fuck did you do to me?" Macias tried to stand up but could not do so because he was bolted down. A bailiff said, "Call first aid." The bailiffs then jumped on Macias. The court said, "Everybody stay right there."

Immediately thereafter, Macias stated, "It didn't have nothing to do with you guys. Officer Bravo—" The court silenced him, stating, "Mr. Macias, you need to keep quiet." The jurors left the courtroom after the defendants were removed from the courtroom. Burgener was taken to the hospital where he received stitches for his wound.

Outside the presence of the jury, in another courtroom, the trial judge summarized what had occurred:

> "So we were in a different department, Department 25, when Officer Bravo was about to testify as a rebuttal witness for the prosecution. He was the last witness before we were going to instruct the jurors. And as soon as Mr. Bravo took the stand, Mr. Macias apparently had secreted a small—very small razor blade that had some cloth wrapped around the bottom of it, so it was probably maybe a quarter of an inch point, maybe, or maybe three-eighths of an inch point. And he slashed—I guess it was in his mouth. He took it out of his mouth and he slashed Mr. Burgener with it.
>
> "[Macias] was I bolted to the floor so he couldn't get up. And so then Mr. Burgener jumped up and yelled and had blood on his face,

27

and apparently, according to Agent Epperson,[9] had a pretty deep cut on his jawline on his right side.

"So Mr. Burgener had to go to the hospital because it looks like he might have to have stitches. He definitely needs to have that wound thoroughly cleaned. And he's no longer here today.

"But we have a jury that we swore in and listened to the entire proceedings and we were about to instruct. And so since Mr. Burgener is at the hospital and cannot be here, I wanted to have Mr. Macias represented when we decide what kind of--how we are going to proceed from here.

"And so that's why you are here, Mr. Cline.[10] And so now I don't know if you had an opportunity to talk to [Polina's attorney] or [Quinteros's attorney], but I kind of wanted to get an idea of what they think should happen next in their judgment."

At that point, Quinteros's counsel made a motion for mistrial, stating that defendant Macias's conduct in the courtroom involved "the same thing that all three defendants are charged with in this case." Polina's attorney stated he was leaning toward a mistrial motion, but first he needed to speak with his client. When Quinteros's attorney pointed out that Macias had been in the courtroom out of the presence of the jury for 30 minutes before he attacked his attorney, the prosecutor responded that Macias attacked Burgener "[o]nly after the jury was brought in[ and] only when the witness took the stand," which suggested Macias slashed his attorney "for the benefit of the jury."

---

9       Steve Epperson, a special agent at the Special Service Unit of the California Department of Corrections, had previously testified during the People's case-in-chief. Agent Epperson, who was in the courtroom at the time Macias slashed Burgener with the razor blade, assisted Burgener in the courtroom before he was taken to the hospital.

10      Attorney Stephen Cline made a special appearance on behalf of Macias.

28

Indicating that the court needed to speak with Macias's attorney to determine whether he wanted to "conflict out," the prosecutor stated that Macias should not benefit from his conduct. The prosecutor suggested Macias would be entitled to a mistrial if Burgener decided he could not continue as Macias's trial counsel because "no one else is ready to represent him at this time." The prosecutor also suggested that the court question the jurors to determine whether they could be fair and that it draft a special jury instruction indicating Macias's conduct could not be used against Quinteros and Polina.

After further discussion, the prosecutor told the court he was going to "change [his] position," noting that he had consulted with a senior deputy attorney general, and he believed "Polina and [Quinteros] have a built in reversal issue because of the horrific act done by Macias." The court noted that the jury had witnessed a "slash attack" that was potentially traumatizing and upsetting for them. Stating that "we're asking a lot" of the jurors by asking them to "forget what [they] saw" and deliberate, the court commented that "we're probably going to do the mistrial route as to [Polina and Quinteros]."

After a recess, Polina's attorney indicated that he had conferred with Polina and that they "wish[ed] to continue on with the trial and finish it up." Quinteros's counsel, however, requested that the court declare a mistrial. Cline, the attorney specially appearing for Macias, stated he thought a mistrial "would be appropriate under the circumstances," but he would "defer to the court." In response, the prosecutor suggested that the court send the jury home to allow the parties to conduct research regarding the issue.

29

Noting that it also wished to hear from Macias's counsel, Burgener, the court declared a recess.

The court brought the jurors back into the courtroom and gave the following admonishment:

"First of all, I want to apologize for you[r] having to witness what some of you witnessed. And I also want to apologize for the inconvenience of having you all interviewed because an alleged crime occurred in your presence, and so you were witnesses to that alleged crime, so you were interviewed as witnesses.

"Now, I've been doing criminal cases, either as a lawyer or as a judge, for 30 years, and this is the first time something like this has ever happened, and so I think all--and there are countervailing constitutional rights at play here for defendants, for the prosecutor, and so most of us have not experienced something like this either, so I think we all just need to--the lawyers need to all call time out and do a little research and try to figure out how we should proceed.

"So what that means for you, is that we'd like you to return tomorrow morning at 10:00, and we're going to have a little conference between 9:30 and 10:00 with the lawyers, and then we're going to try to figure out what our next step is. So it may be that we're going forward and doing closing argument. It may be that we are declaring a mistrial and you'll all be excused. But before we figure out what the answer to some of those questions are, we need to have a little time to research it. Okay.

"So now this is going to be the hardest part of the next 22 hours, is that *you are not to form or express an opinion about this case*, you're not to discuss it among yourselves or with others, so that's really important, because I know that this incident is going to be on the news, and so if you can avoid watching the news, that would be great. It's also going to be in the paper, so please do not read a newspaper article about it, and please do not discuss it with your loved ones. Just say I can't talk about it until the trial is over.

"And I appreciate your work on this case. We're actually, before this happened, we were making very good progress, and we were going to be doing closing argument, some today and some on Friday.

30

"So we're actually way, way ahead of schedule. And so, I mean, we still have a little more time to dedicate to this case, like we told you.

"So anyway, so tomorrow morning at 10:00 o'clock in Department 25. Not here. This is our normal department, but that department is a little bit bigger and it accommodates everybody a little better.

"So you're ordered to appear tomorrow morning at 10:00 o'clock outside Department 25. And like I said, I know it's going to be really hard to compartmentalize this, but I'm going to ask you do that. And *if we do go forward with argument and deliberations, that you not let what happened in the courtroom affect what you think the evidence does or does not show about what happened at Donovan.*

"So *what happened at Donovan is what you're charged with deciding, not what happened in our courtroom.* Okay. [¶] Alright. Thank you very much. And you are excused for the day." (Italics added.)

Outside the presence of the jury, attorney Cline represented to the court that Burgener's wound did not appear to be life threatening and he was being evaluated by a plastic surgeon. Cline also stated that Burgener believed he had a conflict with Macias and he could not effectively represent him. The court then adjourned the hearing to give the parties time to conduct research.

2. *The court's in-camera interviews of the jurors and alternate jurors*

The following day, December 14, the prosecution filed an opposition to the defense motion for mistrial. The prosecution urged the court, before deciding whether a mistrial should be declared, to inquire of the jurors whether they could "put the incident aside and decide this case solely on the facts as presented [at] trial and not be influenced by [Macias's] conduct." The prosecution argued that Macias's attack on his attorney

31

warranted his removal from the courtroom and that by his actions he had forfeited his right to appointed counsel if Burgener was unable to continue representing him.

At the follow-up hearing that day, outside the presence of the jury, attorney Burgener told the court he was prepared to go forward with closing arguments on behalf of Macias.  In response to the court's inquiry, the prosecutor informed the court that any prosecution of Macias for his courtroom behavior would be handled by the Attorney General's Office.  The prosecutor argued that the incident in the courtroom did not necessarily create a conflict between Burgener and Macias and that it was "allowable and appropriate" for Burgener to continue representing Macias.

The trial court then indicated it believed Burgener had an actual conflict with Macias, notwithstanding Burgener's willingness to continue with the trial, and despite the prosecutor's argument to the contrary. Cline, who again was specially appearing on behalf of Macias, told the court he also believed that an actual conflict existed between Burgener and Macias and then represented that Macias did not believe he could work with Burgener.  Burgener reiterated that he was "happy to go forward" despite the fact he had received several fine stitches along his jawline.

The court then held an in camera *Marsden*[11] hearing with Macias, Burgener, and Cline to determine whether Burgener should continue representing Macias.  Following the hearing, the court relieved Burgener as Macias's counsel.  The court also found that Macias had forfeited his right to appointed counsel, indicating that Macias should not

---

11    *People v. Marsden* (1970) 2 Cal.3d 118.

benefit from his own wrongdoing. The court appointed Cline as Macias's standby counsel. The court then stated it would conduct an in camera hearing with each individual juror to determine whether he or she could be fair and impartial, and then it would address any mistrial motions by the defendants.

During the in camera hearing, the court, with counsel present, individually and privately questioned each of the 12 jurors and three alternate jurors outside the presence of the defendants and the other jurors. The court generally asked each juror four questions: (1) whether the juror could put aside what the juror saw, and fairly and impartially evaluate the evidence; (2) whether the juror could not let what the juror saw affect how he or she looked at Quinteros and Polina, given that neither of these defendants was involved in the incident; (3) whether the juror could fairly and impartially set aside what the juror saw with regard to defendant Macias and decide the charges based on what Macias allegedly did on the date of the charged incident; and (4) whether the juror was interviewed by the sheriff.

As pertinent here, jurors Nos. 1, 3, 4, and 7 through 15 indicated that they were able to put aside their observations of the Macias incident and fairly and impartially evaluate the evidence and that the incident would not influence how they viewed the evidence against Quinteros, Polina, and Macias.

Juror No. 2, when asked the first question, stated: "My feeling is yes, but I think if once we adjourn to go through the case, we'll be doing a lot of talking." The court indicated that the conversation should not be about what happened in court between Macias and Burgener, and juror No. 2 replied, "I understand." When the court asked

33

juror No. 2 whether he could abide by an instruction not to consider what had happened in court, he indicated he could do so. Juror No. 2 then indicated he would "certainly try" to not let the incident affect his deliberations with regard to Quinteros and Polina, but indicated that "there's got to be an effect" and noted that he observed "a young man that had a very bad temper." The court asked juror No. 2 whether—as to Macias—he could set aside what happened in court and decide the case on what was said on the witness stand. Juror No. 2 replied, "Yes, we could go through our notes and tally it up and figure what's correct."

Jurors Nos. 5 and 6 indicated they did not believe they could be fair and impartial after observing Macias's conduct. The court excused those jurors and replaced them with alternate jurors.

a. *Quinteros's mistrial motion; Polina's joinder and motion to sever*

Following the in camera interviews of the jurors, and out of the presence of the jury, Quinteros moved for a mistrial based on the slashing incident in the courtroom. Quinteros's counsel argued that Macias, by cutting his attorney with a razor in the courtroom, painted Quinteros and Polina in a bad light, although they were not involved in that incident. He also indicated the Macias incident undermined Quinteros's trial defense of downplaying Ortiz's injuries. Quinteros's counsel also argued the jurors could not put the courtroom incident aside even if they said they could.

Polina and Macias joined Quinteros's mistrial motion. Polina also moved for severance of his trial.

The court noted that 13 of the 15 jurors interviewed said they could be fair and impartial and could set aside what happened, while the two who said they could not were excused. The court stated it did not see how the Macias incident undercut any argument Quinteros intended to make as to the severity of Ortiz's injuries. The court also noted that both Quinteros and Polina sat still during the Macias incident, they appeared to be unaware that Macias was going to do what he did to Burgener, and the jurors indicated they would not hold Macias's actions against Quinteros and Polina.

Following further discussion, the court denied the motions for mistrial, reiterating that the jurors indicated they could be fair and impartial and the court had to "take them at their word" and "trust them." The court also denied Polina's severance motion.

3. *Special jury instructions*

Prior to deliberations, the jury was instructed that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jury the following special limiting instruction:

> "Your task is deciding what occurred on July 5th, 2010, at R.J. Donovan state prison. Once you agree . . . on what the facts are in this case, you are to apply the law set forth in these instructions to those facts.
>
> "Ultimately, you will decide whether this case has been proven beyond a reasonable doubt. If it has not been proven beyond a reasonable doubt, you must find the defendants, or any individual defendant against whom the case has not been proven, not guilty.
>
> "*In reaching your determination, you are not to consider anything that you observed, or heard in the courtroom on December 13, 2012. Those events should not enter into or affect your deliberations in any way*." (Italics added.)

35

4. *Jury deliberations, verdicts, and denial of Polina's new trial motion*

After about four and a half hours of deliberations, the jury found Polina guilty of all three charged offenses (conspiracy to commit murder, attempted murder, and assault with a deadly weapon by a prisoner) and found to be true the gang enhancement allegation attached to each of those three counts.

The jury also found Macias guilty on all three counts.

The jury found Quinteros guilty of assault with a deadly weapon by a prisoner, but found him not guilty of conspiracy to commit murder and attempted murder, and also found the related gang allegations to be not true.

Thereafter, the court denied Polina's motion for a new trial.

B. *Applicable Legal Principles*

Under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution, "[a]n accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."'" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).)

Although "[a] sitting juror's involuntary exposure to events outside the trial evidence" (*Hamilton, supra,* 20 Cal.4th at pp. 294-295) is not misconduct in the pejorative sense, it may still lead to juror bias. (*Ibid.*) Such exposure gives rise to a rebuttable presumption of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 307.)

36

Whether an individual verdict must be overturned as a result of such juror exposure or irregularity "'"'is resolved by reference to the substantial likelihood test, an objective standard."'"'" (*Hamilton*, *supra*, 20 Cal.4th at p. 296.) In *Hamilton*, the California Supreme Court held that "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Ibid.*) In so holding, the high court explained that "[t]he standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. *If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias*.'" (*Ibid.*, italics added.)

In *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*), this court explained that "[w]hen . . . juror misconduct arises from a juror's receipt of extraneous information, juror bias can be inherent or circumstantial. [Citations.] Under the *inherent* bias test, the court considers whether the 'extraneous material, judged objectively, is inherently and

37

substantially likely to have influenced the juror.' [Citations.] Even when the extraneous information is not so prejudicial, in and of itself, as to cause inherent bias, under the *circumstantial* bias test the court must examine the totality of the circumstances surrounding the misconduct to determine whether a substantial likelihood of actual bias nonetheless arose. [Citations.] The judgment must be set aside if the court finds prejudice under either the inherent or circumstantial bias test." (*Id.* at pp. 1116-1117, italics added.)

### 1. *Standard of review*

"We review the denial of a motion for mistrial under the deferential abuse of discretion standard." (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The *Cox* court explained that "'"[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*Ibid.*)

### C. *Analysis*

### 1. *Jury's exposure to Macias's attack on his attorney*

Applying the inherent bias test, we first conclude that codefendant Macias's courtroom attack on his attorney, judged objectively, was not so prejudicial that it was inherently and substantially likely to have resulted in juror bias against Polina such that Polina was denied his constitutional right to a trial by an impartial jury. Nothing in the trial record suggests that Polina played a role in the attack or made any comments or

gestures before, during, or after the attack that reasonably could be construed as either encouragement to Macias or approval of what he did. When the court heard Quinteros's mistrial motion, which Polina joined, the court—outside the presence of the jury—observed that Polina and Quinteros "didn't try to get up, they didn't try to do anything. They didn't encourage Mr. Macias. They acted as if they didn't know that this was going to occur, that this was just something that Mr. Macias did on his own." The court observed that Burgener did not bleed very much, and the jury didn't see any bleeding because Agent Epperson quickly put a paper-towel compression hold on Burgener's cheek. We defer to the court's factual findings. (*Cissna, supra*, 182 Cal.App.4th at p. 1117.)

Applying the circumstantial bias test and examining the totality of the circumstances surrounding Macias's courtroom attack on his attorney, we conclude Polina has failed to meet his burden of showing that a substantial likelihood of actual juror bias against him arose as a result of that incident. When the jurors were brought back into the courtroom following the incident, the court admonished them that if the case proceeded to closing arguments and deliberations, they must "not let what happened in the courtroom affect what [they] think the evidence does or does not show about what happened at Donovan." The court then reiterated that they were charged with deciding "what happened at Donovan . . . , not what happened in our courtroom."

In addition, as noted, the court found that all but two of the jurors were able to put aside their observations of Macias's attack on his attorney and fairly and impartially

39

evaluate the evidence. The court excused those two jurors and replaced them with alternate jurors.

Furthermore, the court repeatedly instructed the jury that the courtroom attack on Burgener by Macias must play no role during deliberations and that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jurors a special limiting instruction admonishing them that they were "not to consider anything [they] observed" in the courtroom during the attack, and that "[t]hose events should not enter into or affect [their] deliberations *in any way*." (Italics added.) Because Macias had been handcuffed after the attack, the court instructed the jury not to consider this fact for any purpose and to not discuss it during deliberations.

We presume the jurors understood and followed the court's instructions (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption. On the contrary, the jury's verdicts strongly indicate the jury followed the court's instructions. While the jury found both Polina and Macias guilty of all three offenses charged in the amended information, it acquitted Quinteros of the two most serious charges: conspiracy to commit murder and attempted murder. The jury also found the gang allegations charged against Quinteros to be not true. These verdicts, viewed objectively in light of the totality of the circumstances, belie Polina's claim that the judgment should be reversed on the ground a substantial likelihood of actual bias against him arose as a result of Macias's courtroom attack on his attorney.

### 2. *Juror No. 2*

Polina, however, suggests his conviction should be reversed because juror No. 2, who was not excused following Macias's attack on Burgener, exhibited actual bias against him. For example, Polina asserts that "[w]hen the court explained it did not want the jury to discuss the courtroom incident and then asked if the juror could set that aside and not let it affect deliberations, Juror No. 2 responded that he would '[c]ertainly try.'" Polina also points out that, when the court asked what he meant, juror No. 2 said, "Well, I think I can, but there's got to be an effect," and also said that he had seen "a young man that [*sic*] had a very bad temper." However, juror No. 2 then indicated that, as to Macias, he (juror No. 2) could set aside what Macias had done in court and decide the case based on the evidence presented.

Juror No. 2's responses to the court's in-camera questioning (discussed, *ante*) do not show juror No. 2 exhibited actual bias against Polina. Juror No. 2 acknowledged the obvious—that, when juror No. 2 witnessed Macias's attack on his attorney, he saw "a young man that [*sic*] had a very bad temper." At this stage of the trial proceeding, juror No. 2 and the other jurors already had seen the video recording of the prison yard attack on Ortiz, and had heard Macias's own testimony acknowledging he had participated in that attack. Even if we were to assume juror No. 2's responses to the court's questions demonstrated a bias, any such bias would have been directed against Macias, not Polina (or Quinteros). That juror No. 2, like the other jurors, were able to obey the court's instruction that Macias's attack on his attorney must play no role in their deliberations and that they must decide the case based on the evidence presented, is inferentially shown

41

by the fact that the jury acquitted Quinteros of the two most serious offenses (counts 1 and 2) and found to be not true the gang allegations against him.

3. *Court's decision that Macias represent himself*

Polina also suggests he was prejudiced by the court's decision to require Macias to represent himself for the remainder of the trial after Macias attacked his attorney. Polina acknowledges, however, that Macias indicated during his closing argument that Polina and Quinteros were innocent and that Macias told the jury that Polina did not have a weapon during the prison yard incident.

For all of the foregoing reasons, we reject Polina's contention that the court abused its discretion and violated his federal constitutional right to a fair and impartial jury when it denied his motion for a mistrial.

IV. *VISIBLE USE OF RESTRAINTS*

Next, Polina contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional right to a fair trial when it denied the motion for mistrial he brought after the court unjustifiably allowed him to be visibly restrained in front of the jury following Macias's courtroom assault on his attorney. We reject this contention.

A. *Background*

On December 13, 2012,[12] in the presence of the jury about one minute after Officer Bravo took the witness stand, Macias slashed his attorney's cheek with a small

---

[12] All further dates are to calendar year 2012.

razor. All three defendants were removed from the courtroom before the jury left the courtroom. Later that morning, outside the presence of the jury, the court made a brief record (discussed, *ante*) of the details of Macias's attack on his attorney.

The next morning, December 14, outside the presence of the jury, the court conducted a hearing at which Burgener, who had received what he described as "fine" stitches for his facial wound, informed the court he was prepared to go forward with closing argument on Macias's behalf. In discussing the courtroom attack with the parties' attorneys, the court began by finding that Quinteros was currently serving a 13-year prison sentence, Macias was serving a 26-year prison sentence, and Polina had a "long prison record."

The court then made the following record—still outside the presence of the jury—pertaining to the use of physical restraints in this case before and after Macias's courtroom attack on Burgener:

> "So *during the entire course of the trial*, all—I don't know if we ever put this on the record—*all three defendants have been bolted down with an I-bolt to the floor*. So that means that *they have leg chains on that are strung to an I-bolt that's cemented into the floor* so they can't stand up all the way. But there's a skirt around the table, so *the fact that they're bolted down . . . is not apparent to the jury.*
>
> "And so *that was done because of the fact that they all have long and violent histories, and because two of them are sentenced prisoners*, and so as a precautionary measure, we had them bolted down, although their hands were free.
>
> "Now that Mr. Macias has attacked Mr. Burgener, I think it's appropriate and necessary to have Mr. Macias chained even in the presence of the jury, with him not have [*sic*] his hands free, although *once the jury comes in, Mr. Polina* and [Quinteros] *will appear unhandcuffed with their hands not restrained.*

43

"And then when Mr. Macias testified, we excused the jury. Mr. Macias got on the stand. He did have leg chains on, but there—It may be apparent to one alternate juror, but not to the other jurors because of the configuration of the witness stand. And then when he was done testifying, we sent the jury out and he came off the stand, so they did not see that he had leg chains on.

"So I just want to put that on the record, because we had not put that on the record before. *There was no objection from any of the attorneys or the defendants to being chained down, bolted down that way*, so that's the way we proceeded, because *we needed that extra security*. And apparently that was not even good enough to prevent what happened yesterday." (Italics added.)

Later that morning, as already discussed, the court conducted an in camera hearing and individually questioned each of the 12 jurors and three alternate jurors to determine whether they were able to put aside their observations of the Macias's courtroom attack on Burgener and fairly and impartially evaluate the evidence. Although the defense attorneys were present during the hearing, the defendants—Quinteros, Macias, and Polina—were not present.

Later, at around 12:16 p.m. that same day (December 14), the court conducted a brief hearing at which Quinteros, Macias, Polina, and their counsel appeared in the presence of the jury. At that hearing, which the record shows lasted only a few minutes, the court admonished and excused the jury, directing them to return on December 19. Outside the presence of the jury, the court conducted a hearing on Polina's mistrial motion, which Quinteros joined. As discussed, *ante*, the court denied the motion.

At the next hearing, held outside the presence of the jury on December 19, Polina's attorney, apparently joined by Quinteros's counsel, renewed the motion for a mistrial,

44

asserting that the jury saw Polina (and Quinteros) shackled on December 14. The court denied the motion, noting that Polina and Quinteros were "shackled in front of the jury very briefly," but were no longer shackled and would not be shackled. Polina's and Quinteros's attorneys declined the trial court's offer to provide the jury a limiting instruction regarding shackles. The court noted that some of the jurors may have seen the defendants getting unchained from the floor[13] on the day of Macias's courtroom attack on his attorney when they were taken out of the courtroom, but this would have been the first time the jurors became aware that the defendants were restrained. The court further noted that, except for "that one brief hearing" at which Polina's and Quinteros's hands were shackled for about five minutes, their hands had never been shackled in court and only Macias continued to be shackled. The court then indicated it intended to instruct the jury that the fact Macias was shackled was not evidence and must be disregarded in deciding the issues of the case.

Shortly thereafter, the jurors were brought back into the courtroom and the court instructed them under CALCRIM No. 204 as follows:

> "[T]he fact that physical restraints have been placed on defendant Eduardo Macias is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."

---

[13]    The court explained that, although the three defendants had been "I-bolted down," there was "a skirt around the table so the jurors [could not] see that."

45

B. *Applicable Legal Principles*

1. *Standard of review* (*use of physical restraints*)

A trial court has broad power to maintain courtroom security and orderly proceedings, and its decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 632.) However, the California Supreme Court has explained that "despite our traditional deference to the trial court in this area, some extraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial." (*Ibid*.) "For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*Ibid*.)

In *Deck v. Missouri* (2005) 544 U.S. 622, 629, the United States Supreme Court held that the right to due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." The high court explained that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury . . . . The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." (*Id*. at p. 633.) The *Deck* court recognized the need to restrain dangerous defendants to prevent courtroom attacks and the need to give trial courts latitude in making individualized

46

security determinations. (*Id*. at p. 632.) The Supreme Court concluded that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" (*Id*. at p. 635, quoting *Chapman, supra,* 386 U.S. at p. 24.)

The California Supreme Court has followed similar principles by holding that "a defendant may be physically restrained at trial only if there is a 'manifest need for such restraints.'" (*People v. Seaton* (2001) 26 Cal.4th 598, 651, quoting *People v. Duran* (1976) 16 Cal.3d 282, 291 (*Duran*); see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].) A trial court "retains discretion to order restraints when they are needed to protect against courtroom violence or other disruptions." (*People v. Stevens*, *supra*, 47 Cal.4th at p. 633.)

Of particular importance here, the California Supreme Court has explained that "[e]ven a jury's brief observations of physical restraints generally have been found nonprejudicial." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1213, citing *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584 (*Tuilaepa*); *People v. Rich* (1988) 45 Cal.3d 1036, 1084.) The Supreme Court has also explained that "[p]rejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen.'" (*Tuilaepa*, at p. 584, quoting *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2.)

47

In *Duran*, our high state court explained that "[t]he showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence." (*Duran*, *supra*, 16 Cal.3d at p. 291.)  Furthermore, "[t]he imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other noncomforming conduct will be deemed to constitute an abuse of discretion."  (*Ibid.*)

2. *Standard of review* (*mistrial motions*)

As already discussed, we review the denial of a motion for mistrial under the deferential abuse of discretion standard.  (*People v. Cox*, *supra*, 30 Cal.4th at p. 953.)

C. *Analysis*

In support of his contention that the court abused its discretion and violated his federal constitutional right to a fair trial by denying his mistrial motion, Polina asserts that "the unjustified visible shackling of [him] on the heels of Macias's attack on his attorney compounded the tremendous prejudice that ensued from that event by falsely conveying to the jury that [*he*] was also dangerous while in the courtroom."  Specifically, Polina complains that he was prejudiced when (1) "the sheriff deputies . . . reacted to Macias'[s courtroom] attack on his attorney in a manner tha[t] exposed [his (Polina's) I-bolt] restraints in a highly visible manner to the jury during a very emotionally[-]charged incident"; and (2) he was "requir[ed] to appear shackled in front of the jury the next day."  Claiming that "nothing warranted his being placed in visible restraints in front of the jury," Polina asserts the judgment must be reversed because "placing [him] in visible

restraints in full view of the jury after Macias attacked his attorney in a manner similar to the way he [(Macias)] attacked Ortiz in prison made it extremely likely that the jury would see him [(Polina)] in the same light that it saw Macias."

We conclude the court did not abuse its discretion in denying Polina's mistrial motion and did not violate his constitutional right to a fair trial by allowing him briefly to be visibly restrained in front of the jury. As already discussed, the California Supreme Court has explained that "[p]rejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period . . . inside . . . the courtroom by one or more jurors . . . .'" (*Tuilaepa*, *supra*, 4 Cal.4th at p. 584.)

Here, the record shows the court acknowledged that some of the jurors may have seen Polina, Macias, and Quinteros being unchained from the courtroom floor on December 13 after Macias attacked his attorney. The court also told counsel outside the presence of the jury that, although the three defendants had been "I-bolted down," there was "a skirt around the table so the jurors [could not] see that." The record also shows the court acknowledged that Polina's and Quinteros's hand were "very briefly" shackled in front of the jury during a hearing the day after Macias's attack on his attorney.

Polina maintains the Attorney General has failed to show there was a manifest need for courtroom security personnel to act as they did on December 13 in response to Macias's attack on his counsel, which allowed the jury "to view [Polina] in the restraints." Polina asserts "there was no evidence that less restrictive means were considered."

Polina's assertions are unavailing. Since the courtroom security personnel could not know whether Macias was acting on his own, his attack on his attorney

49

unquestionably created a manifest need for them to take immediate steps to secure the courtroom, remove the I-bolt restraints, and take the defendants from the courtroom.

We also conclude the court's decision to allow the jury to "very briefly" see Polina and his codefendants with their hands restrained the next morning was similarly justified. The record shows that this was the first time following the Macias's attack on his attorney that the jurors were again in the courtroom in the presence of the defendants. The brief use of visible physical restraints was a reasonable measure that demonstrated to the jury that courtroom security had been restored. The record shows this hearing lasted only a few minutes while the court admonished and excused the jury with directions to return on December 19. This was also the last time Polina's hands were shackled in the presence of the jury. When the jurors returned to listen to the parties' closing arguments, Polina's and Quinteros's hands were not shackled—only Macias's hands remained shackled.

As prejudicial error does not occur simply because the defendant was seen in shackles for only a brief period inside the courtroom by one or more jurors (*Tuilaepa*, *supra*, 4 Cal.4th at p. 584), we conclude the court did not prejudicially abuse its discretion or violate Polina's federal constitutional due process right to a fair trial by an impartial jury. Our conclusion is supported by the fact that, although the jury convicted Polina of all three counts based on the evidence of his guilt, the jury acquitted Quinteros of conspiracy to commit murder and attempted murder, and found the gang enhancements allegations against him were not true.

50

## V. *COUNT 4 GANG ENHANCEMENT*

Polina also contends the 10-year sentence imposed for the count 4 gang enhancement should be reduced to five years under section 186.22, subdivision (b)(1)(B) (hereafter section 186.22(b)(1)(B))[14] because his count 4 conviction of assault with a deadly weapon by a prisoner (§ 4501) is a serious felony, as defined in section 1192.7, subdivision (c)(13) (hereafter section 1192.7(c)(13)), not a violent felony within the meaning of sections 667.5, subdivision (c), and 186.22, subdivision (b)(1)(C).

The Attorney General agrees the count 4 gang enhancement should be reduced from 10 years to five years because Polina's count 4 section 4501 offense is a serious felony under section 1192.7(c)(13).

We conclude the judgment must be modified to reduce the 10-year prison term imposed for the count 4 gang enhancement to a term of five years under section 186.22(b)(1)(B), which, as noted (see fn. 13, *ante*), provides that, "[i]f the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of *five years*." (Italics added.) As both parties correctly acknowledge, Polina's count 4 conviction of assault with a deadly weapon by a prisoner

---

14    Subdivision (b)(1)(B) of section 186.22 provides:  "(b)(1) Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows:  [¶] . . . [¶] (B) *If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years.*"  (Italics added.)

(§ 4501) is a serious felony under section 1192.7(c)(13), which provides: "(c) As used in this section, 'serious felony' means any of the following: [¶] . . . [¶](23) any felony in which the defendant personally used a dangerous or deadly weapon." Thus, under section 186.22(b)(1)(B) the appropriate sentence for the count 4 gang enhancement in this case is five years, not 10 years, and the judgment must be modified accordingly.

VI. *SECTION 654 (COUNTS 2 & 4)*

Last, Polina contends that, if this court affirms his count 1 conviction of conspiracy to murder Ortiz, the judgment should be modified to stay under section 654 both the consecutive 25-year-to-life sentence imposed for his count 2 conviction of attempted murder and the consecutive 16-year sentence imposed for his count 4 conviction of assault with a deadly weapon by a prisoner and the related count 4 gang enhancement, because "the three offenses for which [he] was convicted [(counts 1, 2, and 4] were part of a single intent and course of conduct aimed at harming Ortiz, the only named victim in the pleadings."

The Attorney General agrees Polina's 25-year-to-life sentence for his count 2 attempted murder conviction should be stayed under section 654, but argues the count 4 sentence should not be stayed under that section because his count 4 offense—assault with a deadly weapon by a prisoner—"did not share the same objective as the conspiracy, that is, an objective to murder Ortiz."

We conclude the judgment must be modified to stay under section 654 the sentences imposed for Polina's convictions of both count 2 and count 4 and the count 4 gang enhancement.

52

A. *Background*

The court sentenced Polina to an indeterminate term of 50 years to life for his count 1 conviction of conspiracy to commit murder, plus a consecutive indeterminate term of 25 years to life for his count 2 conviction of attempted murder.

The court also sentenced Polina to a consecutive determinate upper term of 6 years for his count 4 conviction of assault with a deadly weapon by a prisoner, plus a consecutive 10-year term for the count 4 gang enhancement.[15]

B. *Applicable Legal Principles* (*§ 654*)

Section 654, subdivision (a) provides in part:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723).  If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other *imposed and then stayed*."  (*People v. Deloza, supra*, 18 Cal.4th at pp. 591-592, italics added.)

---

[15]    For reasons discussed, *ante*, we have concluded the judgment must be modified to reduce the 10-year prison term imposed for the count 4 gang enhancement to a five-year term under section 186.22(b)(1)(B).

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed.  (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

C.  *Analysis*

1.  *Count 2* (*attempted murder of Ortiz*)

Polina correctly argues that the consecutive sentences the court imposed for his convictions of counts 2 and 4, and the related count 4 gang enhancement, must be stayed under section 654.  Given the prohibition against multiple punishment in section 654, punishment for both conspiracy and the underlying substantive offenses is "impermissible when the conspiracy contemplated only the act[s] performed in the substantive offense[s] [citations], or when the substantive offenses are the means by which the conspiracy is carried out."  (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 615; *People v. Cavanaugh* (1983) 147 Cal.App.3d 1178, 1182 (*Cavanaugh*) ["To punish for a conspiracy to commit illegal acts and for the illegal acts themselves violates the [section 654 prohibition against multiple punishments] if the conspiracy has no objective other than the specific acts charged."].)

Here, as the Attorney General acknowledges, Polina's 25-year-to-life sentence for his count 2 conviction of attempted murder for his act of attempting to murder Ortiz in the prison yard must be stayed under section 654 because (1) he was sentenced to 50

54

years to life for his count 1 conviction of conspiracy to commit murder, (2) his intent and objective in committing both crimes was the same—to murder Ortiz—and, thus, (3) the section 654 prohibition against multiple punishment proscribes the imposition of additional punishment for Polina's attempted murder conviction. (§ 654; *People v. Ramirez, supra*, 189 Cal.App.4th at p. 615; *People v. Cavanaugh, supra*, 147 Cal.App.3d at p. 1182).

Accordingly, the judgment must be modified to stay the 25-year-to-life sentence the court imposed for Polina's count 2 conviction of attempted murder.

2. *Count 4 (assault on Ortiz with a deadly weapon by a prisoner)*

As noted, the Attorney General contends that the 16-year sentence the court imposed for Polina's count 4 conviction should not be stayed under section 654 because his count 4 offense—assault with a deadly weapon by a prisoner (§ 4501)—"did not share the same objective as the conspiracy, that is, an objective to murder Ortiz." This contention is unavailing. As Polina correctly argues, "the three offenses for which [he] was convicted were part of a single intent and course of conduct aimed at harming Ortiz, the only named victim in the pleadings." As already discussed, under section 654 punishment for both conspiracy and an underlying substantive offense is "impermissible when the conspiracy contemplated only the act performed in the substantive offense." (*People v. Ramirez, supra*, 189 Cal.App.4th at p. 615.) Here, the conspiracy to murder Ortiz contemplated Polina's prison yard act of assaulting Ortiz with a deadly weapon. Thus, punishment for both the conspiracy to murder Ortiz and the aggravated assault on Ortiz is impermissible under section 654. (§ 654; *Ramirez,* at p. 615.)

55

Accordingly, the judgment must be modified to stay the six-year sentence the court imposed for Polina's conviction of the count 4 substantive offense of assault with a deadly weapon by a prisoner.

a. *Related count 4 gang enhancement*

The related count 4 gang enhancement—which (for reasons discussed, *ante*) we order reduced from a 10-year prison term to a five-year prison term under section 186.22(b)(1)(B)—must also be stayed under section 654. "Where the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed." (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709, disapproved on other grounds by *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8.) Witkin explains that "[t]he stay of a sentence automatically stays a sentence enhancement imposed with it, because the enhancement cannot be imposed independent of the underlying sentence." (3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 271, p. 429].)

Thus, because the count 4 six-year term for Polina's violation of section 4501 must be stayed under section 654, the attendant count 4 gang enhancement—as modified (for reasons discussed, *ante*) to the reduced term of five years—also must be stayed under section 654. (*People v. Bracamonte*, *supra*, 106 Cal.App.4th at p. 709.) Accordingly, the judgment must be modified to stay that gang enhancement.

DISPOSITION

The judgment is modified to reduce the 10-year prison term imposed for the count 4 gang enhancement to a five-year term under section 186.22(b)(1)(B). The judgment is also modified to stay under section 654 the 25-year-to-life sentence the court imposed for

56

Polina's count 2 conviction of attempted murder, the six-year sentence the court imposed

for his count 4 conviction of the substantive offense of assault with a deadly weapon by a

prisoner, and the attendant count 4 five-year gang enhancement.  The judgment is

affirmed as modified.  The matter is remanded with directions that the superior court

prepare an amended abstract of judgment to reflect these modifications to the judgment

and to forward a certified copy to the Department of Corrections and Rehabilitation.


 

                                                                                NARES, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.